INDEPENDENT SCHOOL DISTRICT of WAUKON, Appellee, v. CITIZENS STATE BANK of WAUKON et al., Defendants; JOHN J. ARNOLD, Appellant.

No. 42049.

APRIL 3, 1934.

O'Brien & O'Brien and Smith and O'Connor, for appellant.

A. E. Sheridan and Senneff, Bliss & Senneff, for appellee.

EVANS, J.—The transactions involved in this litigation occurred in 1924. The litigation was begun in 1925. The pendency of the litigation has been attended with much mortality, including some of the participators in the transaction and the attorney who brought

the action for the plaintiff in the first instance. In June, 1924, the Citizens State Bank, defendant, was a going concern in the town of Waukon. It closed its doors in January, 1925. In June, 1924, it sought to make itself a depository of the funds of the Independent School District of Waukon. Its officers included Niehaus as president; Narum as cashier; Beddow as assistant cashier and vice president; Campbell as bookkeeper; and Arnold as a vice president and director, but not otherwise active. Niehaus became a member of the board of the independent school district and Narum became the treasurer of the same district. In order to accomplish their purpose, it became necessary that the bank furnish a so-called "depository bond", and that Narum furnish a so-called "treasurer's bond." The treasurer's bond is known in the record as Exhibit 1; and the depository bond furnished by the bank is known as Exhibit 2. The latter is the bond sued on. We shall refer to it in the discussion as the depository bond, and to the other as the treasurer's bond. It was the purpose of the bank to furnish suretyship for both bonds by the voluntary signing of its own officials as sureties. On June 12, 1924, both bonds were drawn up in the bank. They were drawn up upon blank forms intended for such purpose, but the forms were not identical. Each bond as drawn up included in the body thereof the names of the purported sureties. These were three in number,—Niehaus, Beddow, and Arnold. In the first instance each of them was signed by Niehaus and Beddow as sureties and were presented to the school board in that form. The finance committee deferred their approval until the signature of Arnold should be obtained. The failure of Arnold to sign the bonds in the first instance was because the bank officials had not had access to him. After their return to the bank, the transaction was neglected for a couple of weeks. Later they were returned to the president of the school board duly signed by Arnold. Whether they were both returned at the same time does not clearly appear. It does appear that Narum obtained the signature of Arnold upon the treasurer's bond and saw him sign the same. No witness remembers seeing Arnold sign the depository bond here in controversy. Both of these bonds came to the finance committee from the president of the school board, Dr. Stillman, who subsequently died prior to the trial. As a matter of evidence, Arnold denies the signature on each of the two bonds. The issue turns upon opinion evidence, expert and non-expert, and upon the circumstances which constitute the setting in

which the transaction originated. The direct evidence is that of Narum, who claims that he saw Arnold attach his signature to the treasurer's bond. He does not remember whether he saw him sign the other bond or not. The circumstance which is emphasized by the defendant is that the signature on the depository bond is somewhat smaller than his usual signature. As above stated, the depository bond was written upon a blank form. This blank form had two spaces for the signatures of sureties and no more. This space had been appropriated by the first two sureties, who signed. The Arnold signature was attached underneath the other two in the restricted space between them and the margin of the paper. This is the explanation of the reduced size of the signature. It is also true that this blank form had only two blank spaces for the qualification of sureties, and these blanks had been appropriated by the first two signers. This is the explanation of the failure of Arnold to qualify as a surety. It is not claimed that the alleged failure of Arnold to sign either bond was the result of any refusal or unwillingness on his part. His explanation of his denial of the signature is:. "No one ever asked me to sign either one of those exhibits. I was not present when they were signed by any one else." He admits the signing of other bonds. The implications of the record are that the bank officials usually signed their depository bonds and that no difference of opinion ever arose between them on that subject. Arnold admits, as a witness, that he signed other similar bonds upon the mere request of other officials. The bank became, not only a depositary of the money of the independent school district, but a depositary also of the public money of the county. The same officials signed the bond for the county as those that signed for the school district. This includes Arnold as an admitted signer.

To accept the defendant's denial at its face is to confront a great improbability which must be considered as a circumstance in the case. If the defendant did not attach his name to the bond, then some one else did. The case thus presented is not one where an agent has innocently assumed to act for another without adequate authority. Some one is guilty of a felonious forgery. The felony is indicated by the fact that the perpetrator imitated the signature of the defendant, and thereby impersonated him. What conceivable motive could there be for such action? He had nothing to gain by such a course and nothing to hope for. There is not a circumstance in the record that points to the possibility of any motive for any

third person to forge the name of the defendant. There was not a moment when the signature of the defendant was not available upon request. The fact that the parties to the transaction had forgotten whether they actually saw the various makers attach their signatures to the instrument is not strange or unusual. There was no controversy involved. A witness might readily remember the occasion of the signing and yet forget the detailed acts of each person. Of the witnesses testifying to the signature, those of the plaintiff impress us as more credible and their testimony more consistent with all the circumstances surrounding the parties than those of the defendant. An observation of the signature and a comparison thereof with other admitted signatures impresses us as giving more support to the genuineness of the signature than to the contrary. We will not attempt an analysis of the expert evidence. Sufficient to say that that offered by the plaintiff strongly supports the identity of the signature as genuine. That offered on behalf of the defendant is not persuasive. It is too lengthy to justify an attempted analysis of it. We shall content ourselves with illustrative quotations from the testimony of the defendant's principal expert. We quote:

"Examining the capital J J's in all of the signatures of Exhibit 40 and in all of the exhibits I have examined and all the other exhibits I have identified here this morning as genuine signatures of Mr. Arnold I have been compelled to the conclusion that Mr. Arnold has no standard way of writing so far as the genealogy of his J's is concerned and I am not able to say whether he wrote the J J's in Exhibits 1 and 2 standing out alone. While these J J's in Exhibits 1 and especially in 2 differ from one another they also differ from the J J's throughout Mr. Arnold's standard signature. I was impressed and believe that Mr. Arnold is not able to confine himself to the space in writing that is necessary to make the standard capital J and therefore if he makes a hundred J's there seem to be a hundred different J's. I left the genealogy of the J's to make no decision. * * *

"Forgeries are of four kinds, one where a person writes a man's name with hardly any effort to imitate the signature, making it easily detectable. The second kind is tracery, traced forgery but there is no element of tracing in this forgery. The third and most common is assimilated forgery. This is divided into assimilated and mentally assimilated forgery. The assimilated forgery is where the

forger gets an original or standard signature and brings it into close proximity to the line on which he is going to force the signature in order that by the eye following the signature he may make a fair pictorial reproduction of the signature. I decided that in this case the forgeries were made by mental assimilation or forgery; that is, the forgery, if it be a forgery, was made by a writer believing he possessed in his mind the way that Mr. Arnold writes his name and therefor he wrote the name J. J. Arnold. I arrived at the conclusion that this is a mentally assimilated forgery; that the man didn't have before him a standard signature of J. J. Arnold but that he wrote the signature from what he believed the signature looked like. * * *

"The J J's, so far as the geometric form is concerned, might have been written by Mr. Arnold. It is hard to tell what Mr. Arnold might have written in the J J's on account of the differentiation of the form. He hasn't any form but an examination of the second J reveals a J unusually small and peculiar in its formation, the upper right-hand portion being practically a straight line. * * *

"I would agree that Mr. Osborne's text is recognized by all experts as the outstanding work. If he says with reference to the kinds of forgery that the man who does it from memory is so rare that he would never expect to find one I would simply express disagreement with his statement because it has not been my experience. *I can reproduce the Arnold signature now and could mix it up with his signature, mix up mine with his, and submit it to any expert and defy them to pick out which were written by me and which were written by Mr. Arnold himself.* * * *

"I will say that if the writer of those signatures had had a copy of Mr. Arnold's signature he would have written so as to make the J J's under Mr. Arnold's normal signature and also the A and when he got through that signature from the copy it would approximate not only the vertical formation of the letter, the spacing and so on, but the pictorial effect, length and everything and that is the reason I say this is a mental assimilation. The party who writes a signature from memory doesn't know all the characteristics in the man's signature. That is where he is going to fall down. He does not carry in his memory the length of the signature. He merely has a mental picture of that signature in his mind. Now in order to make even a reasonable reproduction the writer would doubtless have to study this signature as to the formation of each letter, the lines, slant, connect-

ing lines, the length and everything which goes to make up the signature. Whoever wrote this signature didn't have that memory in his mind; otherwise he would have a better image of Arnold's signature than that is. * * *

"I do not know how anybody else would do. I know what I would do. If you handed me the signature of my wife, and I have seen her write her name hundreds of times, I would positively refuse to say whether it is or is not her signature unless I had standards of her signature. I am an expert on handwriting but I am not an expert on her signature. I have seen it frequently but I couldn't say, from just looking at a signature whether it is hers. I have not a mental picture of the size she writes."

The foregoing is perhaps sufficiently illustrative of the character of the expert evidence thus relied on by the defendant. It will be observed that much of it is not evidence at all, either expert or nonexpert. It is mere hypothesis. If it be true that this witness is unable to verify the signature of his own wife, without the aid of expert facilities, then he has lost something which non-experts still retain. There are yet husbands who are still able to recognize to a practical certainty the signatures of their wives without resort to the aid of measure or microscope. This evidence serves little function here other than to attach uncertainty to all signatures and to all methods of proof thereof, and especially to those methods which have been deemed hitherto as most usual and reliable. The courts must still give credence to the testimony of a husband who thinks he knows the signature of his wife and who will swear to it without mental reservation. Furthermore, the declaration of this witness to the effect that he himself could reproduce the signature of this defendant so successfully as to defy any expert to distinguish between the true and the false,—seems to run counter to the very purpose for which the witness has been called. This challenge amounts to saying that the genuineness of a signature is unprovable either by expert or nonexpert. If this witness can simulate a signature so skillfully that no expert can detect its falsity, then the power to deceive has become more skillful than the power to detect. If this witness *can,* we must assume that others *can.* The evidence of this witness might have proved *more* if he could have testified to a little *less.* The witness has put himself somewhat into this position: As a nonexpert he disclaims the ability to verify the signature of his own

wife; as an *expert* he challenges the expert world to detect the falsity of a signature which he shall have simulated.

Nor are we able to find assistance in the declaration of this witness that the alleged forgery involved herein is to be classified as "mental assimilated forgery". If this be a forgery, we are not interested in its classification. Any kind would be a complete defense. In order to classify the forgery, the witness assumes its existence. That is a hypothesis only. If classification were the objective, the hypothesis would be understandable. But the sole objective here is to ascertain, not classification of an assumed forgery, but the *absence* of forgery. Is the signature genuine? If yea, there is nothing to classify. If nay, the classification is immaterial.

From any point of view we do not think that the foregoing expert evidence has afforded to the defendant any substantial aid. If "mental assimilated forgery" be a real thing, within the concept of the expert, it should be within the power of the expert to translate it into the mind of juror or judge. This has not been done in this record.

After a very careful study of the evidence in this record, expert and nonexpert, we have become firmly convinced of the genuineness of the signature under consideration. We are not insensitive to the great hardship of the case upon the defendant. We think that some of the nonexpert opinions should be accounted for on that score. Friends have sympathized deeply, and their opinions have doubtless been influenced to some extent by their sympathy. We know of no other way to account charitably for some of the nonexpert opinions in the evidence.

The judgment of the district court is accordingly affirmed.

CLAUSSEN, C. J., and KINDIG, ALBERT, and DONEGAN, JJ., concur.